909 P.2d 280 (1996)
128 Wash.2d 388
The STATE of Washington, Petitioner,
v.
Ryan B. ROSE, Respondent.
No. 62139-0.
Supreme Court of Washington, En Banc.
January 11, 1996.
*282 Jim Krider, Snohomish County Prosecutor and Mr. S. Aaron Fine, Deputy County Prosecutor, Everett, for petitioner.
Jessica A. Ryan, Seattle and Nielsen & Acosta, Eric Nielsen, Seattle, for respondent.
*281 MADSEN, Justice.
At issue is whether an unconstitutional warrantless search occurred when a police officer looked with the aid of a flashlight through an unobstructed window of Defendant's mobile home during the evening. We hold that the officer's observations did not constitute an illegal search, and accordingly reverse the trial court's suppression order.
Defendant Ryan B. Rose rented property from John Yarton. Yarton was entitled to use part of a garage located to the right of a parking lot on the property for storage, and he maintained the property by mowing the lawns and cutting brush. A mobile home was on the left side of the parking lot, approximately thirty-five yards away. A shed was located about nineteen yards behind the mobile home.
On November 18, 1991, Yarton went to the property to store some items in the garage. He noticed that the mobile home appeared neglected, and that curtains had been ripped down. The condition of the premises led him to check around the property, and as he did so he noticed a hose going to the shed behind the mobile home. He saw a lock on the shed, and smelled what he thought was marijuana.
Yarton called the police from his home located nearby. Deputy Ty Dekofski responded. When he and Yarton met, Yarton told him that he had been on the land to store some items, contact Rose, and check on the property, and that he had smelled what he thought was marijuana coming from the shed. Yarton and Dekofski drove to the rental property, and parked in the parking area sometime around 7 p.m. They walked together back to the shed, where Deputy Dekofski could smell marijuana. He saw that there were water and electrical lines running into the storage shed, and that the shed was locked. Dekofski looked in a window at the back of the mobile home using a flashlight, and then walked around to the front of the mobile home and knocked. While on the front porch, he shined his flashlight through a window and saw cut marijuana and a scale on a table inside. A second officer joined Dekofski during this investigation.[1]
Dekofski obtained a telephonic search warrant based upon the information he had gathered. During the search, pursuant to the warrant, officers found a complete marijuana grow operation and fourteen pounds of marijuana. Rose was charged with possession of marijuana with intent to manufacture or deliver. He moved to suppress the evidence obtained during the search because Yarton lacked authority to consent to a search of the property. The trial court granted the motion to suppress, and found that the practical effect of the suppression order was dismissal of the case. The State appealed.
In a split decision, the court of appeals affirmed, holding that Yarton lacked authority to consent to a search. The court also rejected the State's argument that the evidence which Dekofski saw through the front window of the mobile home was in open view, legally observed, and sufficient to establish probable cause for issuance of the warrant regardless of whether other information was unlawfully obtained. Finally, the court of appeals held that with the illegally obtained information excised from the warrant, insufficient facts remained to establish probable cause for issuance of the warrant.
We granted the State's petition for discretionary review.
The State challenges only the court of appeals' holding that the officer's warrantless observations through the mobile home window with the aid of a flashlight constituted an unlawful search.

I
The Fourth Amendment provides in part that "[t]he right of the people to be *283 secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." In deciding whether an unconstitutional search has occurred, the court considers whether the defendant had a legitimate expectation of privacy and whether that expectation is one that society is willing to recognize as reasonable. Katz v. United States, 389 U.S. 347, 361, 88 S.Ct. 507, 516-17, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring); State v. Young, 123 Wash.2d 173, 189, 867 P.2d 593 (1994). A legitimate expectation of privacy is one which includes an actual and subjective expectation of privacy. Katz, 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring). "People have a reasonable expectation of privacy in their own homes." Young, 123 Wash.2d at 189, 867 P.2d 593 (quoting Payton v. New York, 445 U.S. 573, 589, 100 S.Ct. 1371, 1381-82, 63 L.Ed.2d 639 (1980)).
However, no search within the meaning of the Fourth Amendment occurs where the "open view" doctrine is satisfied. Under the "open view" doctrine: "`As a general proposition, it is fair to say that when a law enforcement officer is able to detect something by utilization of one or more of his senses while lawfully present at the vantage point where those senses are used, that detection does not constitute a "search"....'" Young, 123 Wash.2d at 182, 867 P.2d 593 (quoting State v. Seagull, 95 Wash.2d 898, 901, 632 P.2d 44 (1981) (quoting in turn 1 Wayne R. LaFave, Search and Seizure § 2.2, at 240 (1978)). Where the open view doctrine is satisfied "`[t]he object under observation is not subject to any reasonable expectation of privacy and the observation is not within the scope of the constitution.'" Seagull, 95 Wash.2d at 902, 632 P.2d 44 (quoting State v. Kaaheena, 59 Haw. 23, 28-29, 575 P.2d 462 (1978)).
There can be no serious question that Officer Dekofski was entitled to walk up onto the porch. "It is clear that police with legitimate business may enter areas of the curtilage which are impliedly open, such as access routes to the house." Seagull, 95 Wash.2d at 902, 632 P.2d 44. Normally "a front porch ... to a house is not a constitutionally protected area, and police officers who enter these areas may do so with their eyes open." State v. Myers, 117 Wash.2d 332, 344, 815 P.2d 761 (1991).
Defendant Rose's mobile home was at the end of a private driveway off a private road, but there was no "private" sign posted, and the property was not fenced. Nothing in the record indicates that any attempt was made to prevent people from approaching the residence. The front porch was accessible from a large parking area near the mobile home. The porch was impliedly open to the public.[2]
Just as the officer could lawfully step onto the front porch, he also could intentionally look through the window. There is no inadvertence requirement under the open view doctrine. 1 Wayne R. LaFave, Search and Seizure § 2.2(a), at 323 (2d ed. 1987). The conduct of an officer at residential premises does not exceed the open view doctrine just because the officer is there deliberately to look for evidence of a crime. State v. Maxfield, 125 Wash.2d 378, 397-99, 886 P.2d 123 (1994) (open view doctrine; investigator *284 went to residence to look for evidence of marijuana grow operation); cf. United States v. Dunn, 480 U.S. 294, 304-05, 107 S.Ct. 1134, 1141-42, 94 L.Ed.2d 326 (1987) (in context of "open fields" doctrine, irrelevant that officer's observation is directed specifically at the identification of marijuana plants growing on area protected by Fourth Amendment) (citing California v. Ciraolo, 476 U.S. 207, 213, 106 S.Ct. 1809, 1812-13, 90 L.Ed.2d 210, rehearing denied, 478 U.S. 1014, 106 S.Ct. 3320, 92 L.Ed.2d 728 (1986)).
In numerous cases courts have upheld the constitutionality of officers' intentional views through unobstructed windows at residential premises while deliberately investigating reports of crime. See, e.g., State v. Gott, 456 S.W.2d 38 (Mo.1970) (no Fourth Amendment violation where officers were legitimately on premises to investigate informant's report that the occupant was in possession of marijuana when they observed defendant through an uncovered window allegedly rolling a marijuana cigarette); State v. Cloutier, 544 A.2d 1277 (Me.1988) (no Fourth Amendment violation where officer who was aware of burglaries in the neighborhood legitimately approached defendant's residence on police business to investigate a possible burglary where the suspicion of such resulted from the only illumination in the residence being in the basement; observation of marijuana through a window from the normal route of access not a search); Latham v. Sullivan, 295 N.W.2d 472 (Iowa Ct.App.1980) (no Fourth Amendment violation where officer legitimately investigating a burglary in the neighborhood approached the only outside entrance to defendant's apartment and while on the landing outside the apartment door observed through an apartment window items allegedly stolen in the burglary); State v. Taylor, 61 Ohio App.2d 209, 401 N.E.2d 459 (1978) (no Fourth Amendment violation where the officer had a right to be on a sidewalk within the premises with the purpose to observe potentially illegal activity involving narcotics, and saw through a window a brown substance believed to be marijuana bagged for sale).
Nor is there any constitutional infirmity resulting because Officer Dekofski looked through a window to the left of the door. First, there is no reasonable expectation of privacy in what can be seen through uncurtained windows. State v. Manly, 85 Wash.2d 120, 124, 530 P.2d 306 (view enhanced by binoculars), cert. denied, 423 U.S. 855, 96 S.Ct. 104, 46 L.Ed.2d 81 (1975); see also State v. Drumhiller, 36 Wash.App. 592, 595-96, 675, P.2d 631 (officers legitimately on residential premises to investigate a reported burglary lawfully stood a few feet from the walkway to the front door for their own protection and to carry out their obligation to investigate; their observation through the unobstructed window of illegal activity within was not a search), review denied, 101 Wash.2d 1012 (1984). Second, courts have frequently upheld observations through unobstructed windows from an impliedly open area, even where the window was to the side of the entry. See, e.g., Sayre v. State, 471 N.E.2d 708 (Ind.Ct.App.1984) (officer went to residence to question occupant about theft; observation from front yard into unobstructed window only a few feet from the front door not a search), cert. denied, 475 U.S. 1027, 106 S.Ct. 1226, 89 L.Ed.2d 336 (1986); State v. Taylor, 61 Ohio App.2d 209, 401 N.E.2d 459 (1978) (officer lawfully on sidewalk within premises looked through window and saw material believed to be marijuana; went onto porch, then jumped off porch and looked through window and saw defendant gathering up material); People v. Donald, 637 P.2d 392 (Colo.1981) (if officer was looking through living room window from a common entrance or similar passageway, the observations did not constitute a search; remand for factual determination); Latham v. Sullivan, 295 N.W.2d 472 (Iowa Ct.App.1980) (officer on landing outside apartment door looked through apartment window and saw items allegedly stolen in burglary); People v. Maltese, 149 A.D.2d 626, 540 N.Y.S.2d 817 (officer approaching door of basement apartment by common means of ingress and egress, observations through window situated next to door not a search), appeal denied, 74 N.Y.2d 743, 545 N.Y.S.2d 117, 543 N.E.2d 760 (1989); United States v. Hersh, 464 F.2d 228 (9th Cir.) (view through window immediately to left of door proper) (holding confirmed in a number of cases, *285 including United States v. Garcia, 997 F.2d 1273 (9th Cir.1993)), cert. denied, 409 U.S. 1008, 93 S.Ct. 442, 34 L.Ed.2d 301 (1972); State v. Cloutier, 544 A.2d 1277 (Me.1988) (officer on walkway immediately outside residence on normal access route glanced into ground level window to immediate right; not a search).[3]
The window through which Officer Dekofski looked is a waist high picture window just left of the front door. Standing on the porch, one can look directly through the window without leaning, bending, or straining the bodyand indeed, there is no evidence in this case that the officer had to leave the porch or maneuver his body in any way to see through the window.
An officer may act as any reasonably respectful citizen. Such a person can be expected to stand virtually anywhere on a porch like the one in this case while waiting for a response from the door, and to look inside while waiting. A resident who leaves unobstructed a window immediately to the left of the front entrance should expect that reasonably respectful persons will look in, even if just out of curiosity.
In short, there is no serious question that Officer Dekofski was lawfully on the porch, and that he could intentionally look through the window while legitimately on the premises deliberately investigating a report of criminal activity. The only serious question in this case is whether it makes any difference that darkness fell before he could complete that investigation.
As stated in Marshall v. United States, 422 F.2d 185, 189 (5th Cir.1970):
When the circumstances of a particular case are such that the police officer's observation would not have constituted a search had it occurred in daylight, then the fact that the officer used a flashlight to pierce the nighttime darkness does not transform his observation into a search. Regardless of the time of day or night, the plain view[[4]] rule must be upheld where the viewer is rightfully positioned.... The plain view rule does not go into hibernation at sunset.
The use of a flashlight has been upheld under the open view theory in a number of contexts. See, e.g., State v. Young, 28 Wash. App. 412, 624 P.2d 725 (where vehicle parked in public place, and officer's observation would not have constituted a search if it occurred in daylight, fact that officer used a flashlight does not transform observation into search), review denied, 95 Wash.2d 1024 (1981); State v. Cagle, 5 Wash.App. 644, 490 P.2d 123 (same), review denied, 80 Wash.2d 1003 (1971); State v. Regan, 76 Wash.2d 331, 457 P.2d 1016 (1969) (same); United States v. Lee, 274 U.S. 559, 47 S.Ct. 746, 71 L.Ed. 1202 (1927) (no search occurred when a Coast Guard patrol used a searchlight to see aboard a motorboat and discovered alcohol on board; use of a searchlight to see on the deck of the motorboat is comparable to use of a field glass or a marine glass, and is not prohibited by the Constitution); Commonwealth v. Johnson, 777 S.W.2d 876, 879 (Ky. 1989) (where defendant left his motel door and window partially open to public view he was deprived of a reasonable expectation of privacy, and the determination of whether contraband lay in plain view should not depend upon existing lighting conditions: "[o]ne seeking to maintain his privacy should reasonably expect that persons disposed to look inside a motel room will not hesitate to enhance their visibility by use of a widely available device such as a flashlight"), cert. denied, 494 U.S. 1085, 110 S.Ct. 1823, 108 L.Ed.2d 952 (1990); State v. Hite, 642 So.2d 55 (Fla.Dist.Ct.App.1994) (officer in bedroom by consent lawfully used flashlight to look into partially open closet area; fact that closet beyond scope of consent irrelevant; use of *286 flashlight to illuminate area not a search but merely enhancement of officer's plain view).
Recently, the United States Supreme Court held that no unlawful search occurred when officers in an "open field" used a flashlight to look through an open door into a barn which the Court assumed was entitled to Fourth Amendment protection. United States v. Dunn, 480 U.S. 294, 304-05, 107 S.Ct. 1134, 1141-42, 94 L.Ed.2d 326, rehearing denied, 481 U.S. 1024, 107 S.Ct. 1913, 95 L.Ed.2d 519 (1987). The Court said use of the beam of the flashlight did not turn the officers' observations into an unreasonable search, and cited the plurality opinion in Texas v. Brown, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983). In Brown, 460 U.S. at 739-40, 103 S.Ct. at 1541-42, the plurality reasoned that it was beyond dispute that the action of an officer shining a flashlight into an automobile without probable cause to search did not violate the Fourth Amendment.
There are few reported cases involving residential premises. However, we find persuasive the reasoning in Commonwealth v. Pietrass, 392 Mass. 892, 467 N.E.2d 1368 (1984). There, the court concluded that the record did not establish whether a police officer was lawfully on an enclosed porch from which he saw evidence through the window of a residence with the aid of a flashlight, and remanded for a factual determination as to whether the porch was an area impliedly open to the public. However, the court held that if the officer was rightfully on the porch, he could see what was in plain view even through a window, and the use of a flashlight did not transform such an observation into a search. Pietrass, 467 N.E.2d, at 1373 n. 12 (citing Marshall, 422 F.2d 185). The court in Pietrass reached this conclusion after acknowledging that the search of a car is different from the search of a house.
As Pietrass suggests, we have examined the lawfulness of the vantage point without reference to use of a flashlight and have concluded that Officer Dekofski was in a lawful vantage point. Next, we examine the intrusiveness of the view, including the use of the flashlight. In accord with the reasoning in Dunn, Lee, and other cases cited above, we hold that the fact that a flashlight is used does not transform an observation which would fall within the open view doctrine during daylight into an impermissible search simply because darkness falls. One who leaves contraband in plain sight, visible through an unobstructed window to anyone standing on the front porch of his residence, does not have a reasonable expectation of privacy in the visible area.
Nor is the mere use of a flashlight an intrusive method of viewing. A flashlight is an exceedingly common device; few homes or boats are without one. It is not a unique, invasive device used by police officers to invade the privacy of citizens, and is far different from the device at issue in State v. Young, 123 Wash.2d 173, 182-83, 867 P.2d 593 (1994). In Young, we held that use of an infrared device to detect heat patterns in the home, which could not be detected by the naked eye or other senses, and which could in effect enable the officer to "see through the walls" of the home, was a particularly intrusive method of viewing which went well beyond mere enhancement of normal senses. A flashlight, in contrast, does not enable an officer to see within the walls or through drawn drapes. Instead, it is a device commonly used by people in this state, and, in fact, would be an expected device for someone to use approaching a mobile home in a rural area at dusk or after nightfall.
Officer Dekofski looked through an unobstructed window to the left of the front door while lawfully standing on the front porch. Rose simply did not have an expectation of privacy in what could be seen through that window in natural light, and the fortuity that darkness fell before Officer Dekofski could investigate the report of criminal activity does not change that fact. There was no Fourth Amendment violation as a result of the officer's observations through the unobstructed window while using a flashlight.

II
Const. art. I, § 7 provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority *287 of law." Both a person's home and private affairs are thus protected. As to one's private affairs, the relevant inquiry is whether the State has intruded into a person's private affairs. Young, 123 Wash.2d at 181, 867 P.2d 593 (citing State v. Boland, 115 Wash.2d 571, 577, 800 P.2d 1112 (1990)). "[U]nder the Washington Constitution the inquiry focuses on `those privacy interests which citizens of this state have held, and should be entitled to hold, safe from governmental trespass absent a warrant.'" Id. 123 Wash.2d at 181, 867 P.2d 593 (quoting State v. Myrick, 102 Wash.2d 506, 511, 688 P.2d 151 (1984)). The open view doctrine applies under the state constitution. See Young, 123 Wash.2d at 182, 867 P.2d 593.
Relying heavily on Young, Rose also contends that use of a flashlight during evening hours of darkness is too intrusive to pass constitutional muster under Const. art. I, § 7. We do not agree. This case is wholly unlike Young, where we held the state constitutional provision was violated by the government's use of an exceedingly intrusive device which effectively allowed officers to see inside a home. Two factors were particularly compelling in Young, i.e. that the device used went "well beyond an enhancement of natural senses" and that it allowed the officers to see "more than what [the defendant] left exposed to public view." Young, 123 Wash.2d at 183, 867 P.2d 593. In contrast, we noted in Young, use of binoculars to confirm what otherwise would have been visible with the naked eye was not constitutionally impermissible. Young, at 183 n. 1, 867 P.2d 593 (citing State v. Manly, 85 Wash.2d 120, 530 P.2d 306, cert. denied, 423 U.S. 855, 96 S.Ct. 104, 46 L.Ed.2d 81 (1975) and State v. Ludvik, 40 Wash.App. 257, 698 P.2d 1064 (1985)). In this case, unlike the circumstances in Young, Rose left marijuana in plain view through an unobstructed window, and the flashlight used by the officer was no more invasive than observations with natural eyesight during daylight would have been. This case is thus similar to cases involving use of binoculars. Just as use of binoculars may enhance the officer's senses to see what lies at a distance but could be seen if the officer were closer, so does use of a flashlight enhance the officer's senses to see after darkness falls what could be seen in natural daylight. While there is no doubt that a person's home is a highly private place, that which is left exposed to anyone standing on a front porch impliedly open to the public has no privacy interest in the item exposed. There was no violation of Const. art. I, § 7 as a result of the officer's observations through the unobstructed window while using a flashlight.
Finally, the facts in this case are very different from those in the case relied upon by the court of appeals. In that case, State v. Tarantino, 322 N.C. 386, 368 S.E.2d 588 (1988), cert. denied, 489 U.S. 1010, 109 S.Ct. 1117, 103 L.Ed.2d 180 (1989), the officer, who had no response to initial knocks on the front door of a two story nonresidential structure built into a hill, climbed the hill using a little-used path, entered a porch on the second floor, again knocked with no response, then searched the back wall until he found cracks in the wall between the doors. "By maneuvering his body and shining his flashlight through the cracks," he saw the interior and marijuana plants. Tarantino, 368 S.E.2d at 590. A distinction clearly exists between cases like Dunn, where the flashlight simply enabled the officer to see through the open barn door what would have been visible in daylight, and cases like Tarantino, where the use of a flashlight was part of a probing examination which went well beyond the scope of the "open view" doctrine.
Officer Dekofski looked through an unobstructed window to the left of the front door while standing on the front porch. Under the circumstances of this case, Rose had no constitutionally protected interest in what could be seen through that window in natural light, and the fact that darkness fell before Officer Dekofski could investigate the report of criminal activity does not change our analysis.
The court of appeals and the trial court are reversed, and this matter is remanded for trial.
DURHAM, C.J., DOLLIVER and GUY, JJ., and PEKELIS, J. Pro Tem., concur.
*288 JOHNSON, Justice (dissenting).
No individual constitutional right is more specifically recognized and protected than the right of an individual to be secure in his or her own home from unreasonable searches and seizures. Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Washington State Constitution specifically state as much. The majority gives this right short shrift, finding no expectation of privacy existed as to items located within Rose's home. The majority errs by failing to properly analyze and apply the open view doctrine; it accomplishes this by compartmentalizing the deputy's conduct instead of looking at the totality of the circumstances as required by our case law. In doing so, the majority erroneously upholds an unconstitutional warrantless search of a home. Properly analyzing all of the deputy's conduct requires me to reach the opposite conclusion. I would affirm the decision of the trial court and Court of Appeals.
A person's home is generally recognized as the area most resolutely protected by the Fourth Amendment and article I, § 7. 1 Wayne R. LaFave, Search and Seizure § 2.3, at 378 (2d ed. 1987); State v. Young, 123 Wash.2d 173, 184-85, 867 P.2d 593 (1994). However, items which a person knowingly exposes to the public, even in his or her home, are not protected by the Fourth Amendment and article I, § 7. Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); Young, 123 Wash.2d at 182, 867 P.2d 593. We have labeled this doctrine the open view doctrine. State v. Seagull, 95 Wash.2d 898, 901, 632 P.2d 44 (1981). The open view doctrine "encompasses those circumstances in which an observation is made by a police officer without a prior physical intrusion into a constitutionally protected area." 1 LaFave § 2.2(a), at 322. All citizens have a reasonable expectation of privacy in those items and activities in their homes, but that expectation will not be protected if the requirements of the open view doctrine are met.
The majority errs by forgetting the issue it originally, and properly, set out to decide: whether an unconstitutional warrantless search occurred. The correct starting point in every search and seizure analysis is that warrantless searches are per se unreasonable, absent proof by the State that one of the few, narrow exceptions apply. State v. Leach, 113 Wash.2d 735, 738, 782 P.2d 1035 (1989). Deputy Dekofski did not have a warrant when he entered onto the land leased by Rose; thus, the State has the burden of proving that one of the limited exceptions to the warrant requirement applies, or that the deputy's conduct did not amount to a search. Our case law establishes what the State must show. Here, the State fails the test.
The majority erroneously applies the open view doctrine and fails to require the State to meet its burden. We discussed the open view doctrine at length in Seagull, 95 Wash.2d at 902-03, 632 P.2d 44. Under the open view doctrine, no search occurs when a law enforcement officer detects something by using one or more of his or her senses while lawfully present at the vantage point where those senses are used. Seagull, 95 Wash.2d at 901, 632 P.2d 44. Thus, an officer on legitimate police business is free to use all of his or her senses in entering areas of the curtilage that are impliedly open to the public. Seagull, 95 Wash.2d at 902, 632 P.2d 44. An officer is allowed the same license to intrude as a "reasonably respectful citizen." Seagull, 95 Wash.2d at 902, 632 P.2d 44 (citing United States v. Vilhotti, 323 F.Supp. 425, 431 (S.D.N.Y.), aff'd in part and rev'd in part, 452 F.2d 1186 (2d Cir.1971), cert. denied, 406 U.S. 947, 92 S.Ct. 2051, 32 L.Ed.2d 335 (1972)). Any substantial departure from the access route or particularly intrusive method of viewing, however, will exceed the scope of the implied invitation and intrude on a reasonable expectation of privacy, and constitute an unlawful search. Seagull, 95 Wash.2d at 903, 632 P.2d 44. In Seagull, we adopted seven factors to aid us in determining whether an officer's conduct was unreasonably intrusive such that it exceeded the scope of the implied invitation: (1) whether the officer spied into the house; (2) acted secretly; (3) acted after dark; (4) used the most direct access route; (5) tried to contact the resident; (6) created an artificial vantage point; and (7) made the discovery accidentally. Seagull, 95 Wash.2d at 905, 632 P.2d 44; *289 State v. Myers, 117 Wash.2d 332, 345, 815 P.2d 761 (1991). In order to apply these factors, all of the facts and circumstances of the particular case must be considered. State v. Maxfield, 125 Wash.2d 378, 399, 886 P.2d 123 (1994); Seagull, 95 Wash.2d at 903, 632 P.2d 44.
By focusing on the conduct of Deputy Dekofski and the factors in Seagull, it is clear that the trial court and Court of Appeals were correct in finding Deputy Dekofski's conduct to be unreasonably intrusive such that it exceeded the scope of the implied invitation open to the reasonably respectful citizen. Applying the factors from Seagull to the facts of this case we see that Deputy Dekofski spied into the mobile home; he acted secretly and after dark; he used a circuitous route to reach the front porch and door; he tried to contact the resident only after determining that no one could be home; and he made his discovery as the direct result of an intentional warrantless search. Seagull requires us to consider the entire course of conduct engaged in by the officer; it does not allow us to arbitrarily partition the officer's conduct into separate actions in order to consider only those actions which would conform with the open view doctrine. Seagull, 95 Wash.2d at 903, 632 P.2d 44. It is not our place to evaluate what Deputy Dekofski might have done; rather, we must look at what he actually did.
In this case, both the State and the majority concede that Deputy Dekofski's search of the shed and the rear of the mobile home was an illegal warrantless search. However, in footnote 2 the majority, without explanation, holds this illegal warrantless search to be immaterial to the ultimate issue of whether the deputy was rightfully on the front porch when he looked through the front window with his flashlight. Majority at 283 n. 2.[1] The majority fails to consider this illegal conduct in conjunction with Deputy Dekofski's conduct on the front porch, and also fails to apply these facts and circumstances to the factors outlined by Seagull. This arbitrary compartmentalization of the conduct at issue does violence to the purpose and meaning of the open view doctrine.
None of the cases cited by the majority support the proposition that an officer's intentional view into a residence is constitutionally permissible when the officer's prior conduct is unlawful. The officers involved in those cases were all on the way to the entrance of the residence at issue in order to contact the resident (factor six from Seagull). None of the officers in question made their intentional observation following conduct that amounted to an unconstitutional warrantless search. See State v. Gott, 456 S.W.2d 38, 39, 41-42 (Mo.1970) (holding no search when officer is performing lawful duty of approaching front door to discuss the matter); State v. Cloutier, 544 A.2d 1277, 1279 (Me.1988) (no search when officer viewed marijuana on way to door to see if anyone was at home (relying on Seagull)); Latham v. Sullivan, 295 N.W.2d 472 (Iowa Ct.App. 1980) (no search when officer approached only entrance to residence located above business which had just been burglarized); State v. Taylor, 61 Ohio App.2d 209, 401 N.E.2d 459 (1978) (no search when officer was on path to front door and saw marijuana through window into apartment).
The facts in this case also differ markedly from those of our own cases where we have *290 held no search occurred under the open view doctrine. In Seagull, we held no search occurred when an officer, investigating another crime, took a normal route to the door of a residence to contact the residents and saw what he believed to be marijuana in an adjacent greenhouse. Seagull, 95 Wash.2d at 905, 632 P.2d 44. The officer did not leave the route to the door in order to spy into the greenhouse. Seagull, 95 Wash.2d at 905, 632 P.2d 44. Similarly in Maxfield, we held no search occurred when a private investigator working with a drug task force saw evidence of a marijuana grow operation when he went directly to the front door of a home. Maxfield, 125 Wash.2d at 399, 886 P.2d 123. The investigator then followed the normal path to a garage entrance because he thought he heard activity in the garage. When no one answered at either door, he immediately left the premises. Maxfield, 125 Wash.2d at 399, 886 P.2d 123.
The conduct of Deputy Dekofski does not conform with that of the officers in the previously cited cases where the open view doctrine was found to apply. As the rule in Seagull states, an officer on "legitimate business" can enter areas impliedly open to the public. In deciding whether an officer is on legitimate business, his or her conduct prior to reaching the "lawful vantage point" is relevant. In this case, Deputy Dekofski may have initially had legitimate business on the front porch if he had proceeded directly to the front porch in order to contact Rose or ascertain whether he was home. Those are not the facts of this case. Instead, Deputy Dekofski initially searched the shed and then the rear of the mobile home. This included spying into the rear windows with a flashlight. By the time Deputy Dekofski made it to the front porch, he could be certain no one was at home: there were no lights on, he had been there without seeing any activity; and just prior to the deputy's arrival Mr. Yarton had knocked on the front door and not seen anyone. Thus, by the time Deputy Dekofski climbed the stairs to the porch, he had no legitimate business there. His purpose was not to contact someone he knew was not at home; it was to finish his illegal warrantless search by making an effort to look into an adjacent window with his flashlight.
Deputy Dekofski quite deliberately set about collecting evidence, without a warrant, in an unreasonably intrusive manner, and exceeded the scope of the implied invitation open to the reasonably respectful citizen. It belies common sense to conclude the officer's action in peering through the window next to the front door was anything other than what it wasa continuing warrantless search into a home. By the time the officer had arrived on the front porch, the State has not shown it was for the purpose of ascertaining whether anyone was home. Thus, the State has not met its burden of showing the objects in the front room were in open view.
In addition to my disagreement with the majority's conclusions, I also find fault with the majority's failure to provide the trial court any guidance concerning the proper action on remand. The State failed to appeal the Court of Appeals decision concerning the issue of Yarton's (the landlord) ability to consent to the search. The Court of Appeals held Yarton had no authority to consent to the search of the locked shed and affirmed the suppression of the observations and evidence taken at the locked shed. State v. Rose, 75 Wash.App. 28, 36, 876 P.2d 925 (1994). The State has not briefed, shown, nor argued here that the evidence observed through the front window (if admitted) would independently support a search of the shed under the warrant. Even though the majority reverses the Court of Appeals, under the majority's decision any evidence found in the locked shed is still suppressed.
I would affirm the decisions of the trial court and the Court of Appeals.
ALEXANDER, SMITH and TALMADGE, JJ., concur.
NOTES
[1] While Dekofski was on the premises two men with bolt cutters arrived. They were read Miranda warnings, and upon questioning said that they knew there was a marijuana grow operation on the premises and they were there to steal it.
[2] The State has conceded the activity at the rear of the mobile home and the shed was illegal. Information obtained during that illegal search must be stricken from the affidavit in support of the warrant, and cannot be used to determine probable cause to issue the warrant. See, e.g., State v. Coates, 107 Wash.2d 882, 887, 735 P.2d 64 (1987). However, Officer Dekofski legitimately responded to the landlord's report of a possible marijuana grow operation. In responding to that report, he was entitled to approach the front of the mobile home, access the residence by the impliedly open way between the parking area and the mobile home, and step up onto the front porch to conduct his investigation. Any information gathered at the rear of the home did not alter the fact that Officer Dekofski already had the information leading him to a legitimate investigation at the front of the mobile home. Under these circumstances, the officer's deviation to the area back of the home is immaterial in assessing the validity of his view from the porch of the mobile home. The illegal search did not taint the open view from the front porch, and did not turn what otherwise is a lawful vantage point into an unlawful one. See generally, e.g., State v. Chapin, 75 Wash.App. 460, 463, 879 P.2d 300 (1994) (discussing derivative evidence rule and citing Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)), review denied, 125 Wash.2d 1024, 890 P.2d 465 (1995).
[3] In contrast, where the window through which an officer looked was eight feet from the fire escape and well out of the view of anyone engaged in normal use of the fire escape, the officer's view through the window was a search. State v. Alexander, 170 N.J.Super. 298, 406 A.2d 313, 316 (1979), aff'd, 173 N.J.Super. 260, 414 A.2d 36 (1980). However, the court in Alexander noted the general rule that "police may enter upon portions of private property normally open to the public, such as a front porch, and attain a plain view observation through a window." Alexander, 170 N.J.Super. at 304, 406 A.2d 313.
[4] The term "plain view" here is used in the sense that we use the term "open view."
[1] By separating the conduct into two separate acts, the majority forgets the original issue it set out to decide: was this an illegal warrantless search. That determination requires looking at all of Deputy Dekofski's conduct, including that at the shed and rear of the mobile home. The majority justifies its bifurcation of the conduct by stating the illegal conduct did not taint the view from the porch, and citing a Court of Appeals case discussing the exclusionary rule. Majority at 283, n. 2 (citing State v. Chapin, 75 Wash.App. 460, 463, 879 P.2d 300 (1994), review denied, 125 Wash.2d 1024, 890 P.2d 465 (1995)). The exclusionary rule is not the issue in this case, and the cited case lends no support to the majority's contention that the deputy's conduct must be considered separately. Additionally, even if this were a case hinging on the application of the exclusionary rule, the majority has failed to identify the correct exclusionary rule required by article I, § 7. See State v. White, 97 Wash.2d 92, 110-12, 640 P.2d 1061 (1982); State v. Boland, 115 Wash.2d 571, 582-83, 800 P.2d 1112 (1990) (violation of an individual's article I, § 7 rights automatically requires exclusion of the evidence seized). See generally Sanford E. Pitler, The Origin and Development of Washington's Independent Exclusionary Rule: Constitutional Right and Constitutionally Compelled Remedy, 61 Wash. L.Rev. 459 (1986).